KAREN L. LOEFFLER
United States Attorney

STEVEN E. SKROCKI
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: steven.skrocki@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>KENNETH ZONG, )<br>)<br>Defendant. )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>_____ ) | No.<br><br>COUNT 1:<br>CONSPIRACY TO VIOLATE IEEPA<br>  Vio. of 18 U.S.C. § 371<br><br>COUNT 2:<br>UNLAWFUL PROVISION OF SERVICES<br>TO IRAN<br>  Vio. of 50 U.S.C. § 1705<br><br>COUNT 3:<br>MONEY LAUNDERING CONSPIRACY<br>  Vio. of 18 U.S.C. § 1956(h)<br><br>COUNTS 4-47:<br>MONEY LAUNDERING<br>  Vio. of 18 U.S.C. § 1957(a) |

I N D I C T M E N T

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### The Conspirators

1.      KENNETH ZONG was a citizen of the United States who spent most of his adult life residing in, and doing business in Anchorage, Alaska. At some point unknown, and continuing up to the times listed in this indictment, KENNETH ZONG moved to and resided in Seoul, South Korea. While residing in Seoul, South Korea, KENNETH ZONG was involved in a multitude of business ventures.

2.      Unindicted Co-Conspirator A was a citizen of the United States who, during the times listed in this indictment, resided in Anchorage, Alaska, and elsewhere. During the course of this conspiracy, unindicted Co-Conspirator A traveled to Seoul, South Korea, to meet with KENNETH ZONG about this scheme at least once. This meeting occurred in July 2011.

3.      Unindicted Co-Conspirators B, C, and D were citizens of the Republic of Iran, who resided in the Republic of Iran, and elsewhere. During the course of the conspiracy, unindicted Co-Conspirators B, C, and D also traveled to South Korea to meet with KENNETH ZONG at least once about this scheme in 2011.

### The Iranian Sanctions

4.      At all times material to the indictment, the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, gives the President of the United States broad authority to regulate exports and other international transactions in times of national emergency. IEEPA controls are triggered by an Executive Order

declaring a national emergency based on an "unusual and extraordinary threat, which had its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." Pursuant to the authority under IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain practices and transactions with respect to various sanctioned nations by U.S. persons or involving U.S. origin goods.

5.     Pursuant to IEEPA, 50 U.S.C. § 1705, it is a crime for a person to willfully commit, willfully attempt to commit, willfully conspire to commit, or willfully cause a violation of any license, order, regulation, or prohibition issued under IEEPA.

6.     On March 15, 1995, the President issued Executive Order 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and … declare[d] a national emergency to deal with that threat."

7.     On May 6, 1995, the President issued Executive Order 12959 to take additional steps with respect to the national emergency declared in Executive Order 12957 and to impose comprehensive trade and financial sanctions on Iran. These sanctions prohibited, among other things, the exportation or re-exportation to Iran or the Government of Iran of any goods, technology, or services from the United States.

8.     On August 17, 1997, the President issued Executive Order 13059 consolidating and clarifying Executive Orders 12957 and 12959 (collectively, "Executive Orders"). In addition to the prohibitions contained in Executive Orders 12957 and 12959, Executive Order 13059 prohibited the exportation, re-exportation, sale, or supply,

directly or indirectly from the United States, or by a United States person, wherever

located, of any goods, technology, or services to Iran or the Government of Iran. The

Executive Orders authorized the United States Department of the Treasury to promulgate

rules and regulations necessary to carry out the Executive Orders. Pursuant to this

authority, the Secretary of the Treasury, through the Office of Foreign Assets Control

("OFAC"), issued the Iranian Transactions Regulations, subsequently renamed the Iran

Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560, implementing the

sanctions imposed by the Executive Orders.[1]

     9.    The ITSR imposes, among others, the following prohibitions:

**Section 560.203 – Evasions; attempts; causing violations; conspiracies.**

(a) Any transaction on or after the effective date that evades
or avoids, has the purpose of evading or avoiding, causes a
violation of, or attempts to violate any of the prohibitions set
forth in this part is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions
set forth in this part is prohibited.

**Section 560.204 – Prohibited exportation, re-exportation, sale, or supply of goods, technology, or services to Iran.**

Except as otherwise authorized [by OFAC] . . ., the
exportation, re-exportation, sale, or supply, directly or
indirectly, from the United States, or by a United States
person, wherever located, of any goods, technology, or
services to Iran or the Government of Iran is prohibited,
including the exportation, re-exportation, sale, or supply of

---

[1] On October 22, 2012, OFAC changed the heading of the "Iranian Transactions Regulations" to the "Iranian Transactions and Sanctions Regulations," amended the renamed ITSR, and reissued them in their entirety. The prohibited activities set forth herein were in effect under the ITR and remain in full force and effect under the ITSR.

any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or re-exportation, directly or indirectly, to Iran or the Government of Iran; or

(b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or re-exported exclusively or predominantly to Iran or the Government of Iran.

**Section 560.206 – Prohibited trade-related transactions with Iran; goods, technology, or services.**

(a) Except as otherwise authorized pursuant to this part … no United States person, wherever located, may engage in any transaction or dealing in or related to:

(1) Goods or services of Iranian origin or owned or controlled by the Government of Iran; or

(2) Goods, technology, or services for exportation, re-exportation, sale or supply, directly or indirectly, to Iran or the Government of Iran.

(b) For purposes of paragraph (a) of this section, the term transaction or dealing includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing.

**Section 560.208 – Prohibited facilitation by United States persons of transactions by foreign persons**.

Except as otherwise authorized [by OFAC] . . ., no United States person, wherever located, may approve, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by this part if performed by a United States person or within the United States.

Page 5 of 22

10.     Under the ITSR, the term "United States person" includes United States citizens, permanent resident aliens, any persons in the United States, as well as companies and other entities organized under United States law, including their foreign branches, and entities incorporated outside the United States that are ultimately owned or controlled by United States persons.

11.     At no time did KENNETH ZONG, or any of his co-conspirators, apply for, receive, or possess the requisite license or authorization from OFAC for any of the prohibited conduct set forth in this indictment.

12.     For purposes of this indictment, the prohibitions under ITSR promulgated under the President's authority pursuant to IEEPA as detailed above are referred to hereafter as "the Iranian Sanctions."

13.     The Iranian rial is not a currency which is regularly or easily traded on the world financial market; thus, the purchasing power of the rial is limited unless it can be converted into a more marketable currency such and dollars or euros.

**The Korean Trade Relationship with the Government of Iran**

14.     At all times material to this indictment, the government of South Korea maintained a trade relationship with the government of Iran.  To further this relationship, the Central Bank of Iran maintained a restricted and controlled account for the deposit of Iranian funds, held as Korean won at, among other places, the Industrial Bank of Korea. Pursuant to various international agreements, South Korea pays for purchases of Iranian commodities by depositing Korean won into various controlled and restricted Iranian accounts at large Korean banks, such as the Industrial Bank of Korea.  Under this

mechanism, funds from Iran's restricted won denominated account can only be applied toward the purchase of Korean commodities. However, transfer of the Korean won denominated, Iranian owned funds from the restricted accounts into the worldwide financial market is controlled by the Korean government. Payments for Korean commodities are only authorized from the restricted accounts after a multi-step review process involving the Korean government, the Bank of Korea, and the participating bank. The review process includes examination of the applicable business documentation, such as contracts, import/export documents, purchase orders and bills of lading.

## COUNT ONE
### The Conspiracy

15.    Beginning as early as in or around January 2011, the exact date being unknown to the Grand Jury, and continuing through at least in or around April 2014, in Seoul, South Korea, and the District of Alaska and elsewhere, the defendant, KENNETH ZONG, unindicted Co-Conspirators A, B, C, and D, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other, to commit an offense against the United States, that is, to willfully provide services to, and engage in transactions with, directly or indirectly, Iran or any person(s) subject to the jurisdiction of the Government of Iran, in violation of Title 50, United States Code, Section 1705 (IEEPA), and Title 31, Code of Federal Regulations, Parts 560.203, 204, 206, and 208 (ITSR), and (b), to defraud the United States Government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of goods,

technology, and services by a United States person to Iran and other countries without having first obtained the required license from OFAC, by deceit, craft, trickery, and dishonest means, all in violation of Title 18, United States Code, Section 371.

## Purpose of the Conspiracy

16.     The purpose of the conspiracy was for KENNETH ZONG and his co-conspirators to evade the prohibitions of IEEPA and ITSR by engaging in false, fictitious and fraudulent transactions which were designed to unlawfully convert and did convert Iranian owned funds equivalent to approximately $1 billion United States dollars, held in Korean banks, out of the restricted accounts and into more easily tradeable currencies, such as dollars and/or euros, with KENNETH ZONG transferring those currencies worldwide, and receiving payment for these acts from individuals subject to the jurisdiction of the Government of Iran.

## Manner and Means of the Conspiracy

17.     The manner and means by which the defendant and his co-conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

18.     Beginning in at least January 2011, KENNETH ZONG and unindicted Co-Conspirators B, C, and D, along with others known and unknown to the grand jury, created an intermediary trading scheme that purported to have *KSI Ejder/Anchore*, a shell company created by KENNETH ZONG and based in Seoul, South Korea, to fictitiously "sell" marble tiles and other construction supplies to Company A, a shell company domiciled in Kish Island, Iran.  According to the scheme, *KSI Ejder/Anchore* fictitiously "purchased" Italian marble tiles and other construction supplies from *MSL & Co*

Page 8 of 22

*Investment Trading*, (*MSL Investment Dubai*) an Iranian-controlled shell company located in Dubai, which were fictitiously "shipped" directly to Company A in Iran. Pursuant to the conspiracy, false and fictitious contracts, bills of lading, and invoices were created by KENNETH ZONG and his co-conspirators to show Korean government banking regulators, banks and other reviewing officials that Company A owed *KSI Ejder/Anchore* for the false marble purchases. The conspiracy resulted in the transfer of Iranian funds, at the direction of KENNETH ZONG's co-conspirators, from the restricted Iranian bank account to KENNETH ZONG'S *KSI Ejder/Anchore* account. KENNETH ZONG, at the direction of his co-conspirators, thereafter transferred the funds to entities and individuals throughout the world including Alaska and other states.

19.     It was further a part of the conspiracy that KENNETH ZONG obtained payment for his acts in the amount equivalent to $10 to $17 million United States dollars.

## Overt Acts

20.     In furtherance of the Conspiracy, and to accomplish its purpose and object, at least one of the co-conspirators committed and caused to be committed at least one of the following overt acts, among others:

21.     On or about July 2009, KENNETH ZONG registered a company under the name of "*KSI Ejder Korea, Inc.*" in Seoul, South Korea.

22.     Between January 2011 and April 2014, KENNETH ZONG also created or operated the following shell companies, including; "*Dynamic First,*" "*AutoPex Corporation,*" "*Topex Corporation*" and "*Gem Art Corporation*," in furtherance of the conspiracy.

23.    On or about January 27, 2011, an associate of unindicted Co-Conspirators B, C, and D emailed KENNETH ZONG a document dated January 15, 2011, in which *KSI Ejder/Anchore* purported to enter into a written agreement to sell Iran-based Company A marble tiles for delivery to Iran.

24.    In a document dated January 17, 2011, *KSI Ejder*/*Anchore* and *MSL Investment Dubai* purportedly arranged for the purchase of approximately $2,277,102 USD worth of marble.

25.    On a commercial invoice dated January 21, 2011, *KSI Ejder* was designated as the shipper to the consignee, Company A, located in Kish Island, Iran for marble tiles worth 2,000,000,000 Korean won (approximately $1,840,000 USD).  KENNETH ZONG signed for *KSI Ejder Inc*.

26.    In a document dated January 22, 2011, KENNETH ZONG, signing for *Anchore* and unindicted Co-Conspirator B, signing for "*MSL & Co Investment Trading*" (*MSL Investment Dubai*) entered into an agreement that "*MSL Gulf Trading*" will receive payment for fees and costs associated with *Anchore's* transactions between "Company A in Iran" and "*MSL Investment*" in Dubai.  The subject line of the document was, "*Export construction material to Iran*."

27.    On a commercial invoice dated January 24, 2011, KSI was designated as the shipper and Company A which was located in Kish Island, Iran as the consignee. KENNETH ZONG signed for *KSI Ejder*.  The invoice for the fictitious marble tiles was in the amount of 650,000,000 Korean won, or, approximately $598,000 USD.

28.     On January 25, 2011, KENNETH ZONG opened an account at Industrial Bank of Korea in Korea in the name of *KSI Ejder*.  Two days later, on January 27, 2011, Bank Maskan, a commercial bank in Iran, issued a payment order to IBK to transfer 2,000,000,000 Korean won (approximately $1,840,000 USD equivalent) into *KSI Ejder's* IBK account.

29.     A day later, on January 28, 2011, Bank Maskan issued another payment order to IBK to transfer 650,000,000 Korean won into *KSI Ejder's* IBK account, approximately $598,000 USD.

30.     On or about February 1, 2011, KENNETH ZONG emailed an individual known to the grand jury with directions on how to document the fraudulent business between *KSI Ejder/Anchore* and Company A:

> *"Dear ----,*
>
> *According to new regulation of Korea Central bank from Jan 01, 2011, we need additional documents as follows,*
>
> *1. Certificate of Incorporation (company registration) of ...(Company A)*
> *2. Commercial Invoice (Invoice # 2011/010. 2011/020. 2011/030. 2011/040. 2011/050.)*
> *3. Bill of Lading.*
>
> *Commercial Invoice issued by Italian Exporter must state that terms of payment is DP (Document against payment and partial shipment allowed) you can put any amount for future transfer. B/L state that prepaid from Italian port to UAE port. Just paper works, need to compose accurately. if you have any question, please call me. I have received an approval for commodity (none-Sactioned & non-prohibited) and* Company A *(no in black list company) too much works as first time but next one will be easier.*
>
> *Regards/ken"*

Case 3:16-cr-00142-SLG-DMS   Document 2   Filed 12/14/16   Page 11 of 22

31.     On or about February 1, 2011, KENNETH ZONG replied to a person

known to the grand jury with further instruction on how to make *KSI Ejder* appear it was

showing a profit so as to legitimize the business:

> *"ok (Name Removed), Let's do this way.*
> *UAE company issues an OFFER SHEET to KSI EJDER KOREA INC then I will*
> *issue a Commercial INVOICE to* Company A *based on UAE Offer sheet.*
> *OFFER sheet must be back dated Jan 17, 2010 and description of commodity*
> *is various different kinds of Italian Marbel Tile, finished in UAE (which country ?)*
> *Offer sheet must be lower amount than INVOICE amount. Invoice amount shall be*
> *KRW 2,650,000,000.- OFFER price should be USD2,303,347.80 (or similar). it*
> *shows KSI EJDER makes a little profit, Again this is just paper*
> *works for to get approval from Korea Central bank. Regards/ken"*

32.     On or about March 7, 2011, KENNETH ZONG sent an email to the email

address *orchideagulf@yahoo.com* in which he admitted the fraudulent nature of the

business with the Iranians:

> *"To : Messrs MSL & Co and* (Name redacted),
> *Repeatedly your requesting me the bank statement in related to exchange rate*
> *and calculation, please keep in your mind the followings (sic)*
>
> 1. *Korean government (KOSTI)* (the Korea Strategic Trade Institute) *and Korea*
>    *central bank including Industrial Bank of Korea or Woori bank know well our*
>    *transactions are based on fabricated &fake documents such as B/L, Proforma*
>    *Invoice, Sell and purchase agreement.*
> 2. *There is a great dangerous risk for me and authorities who are cooperating to*
>    *do transaction according to my requesting without proper investigation. (I told*
>    *them not do)*
> 3. *For pursuing our transaction continuously, I have agreed to give an allowance*
>    *to bankers and authorities under the table KRW 3.- to 7.- per dollar depending*
>    *on volume of transaction.*
> 4. *In regards to any /all transaction with Iranian company is under control of*
>    *very tight regulation set by law of UN sanctions so special task force against*
>    *Iran transaction was formed in KOSTI.*
> 5. *Iranians knows well, and I know, they have been paid over 15% fees of amount*
>    *to the Korean companies, otherwise no one wants to be get in trouble and*
>    *jailed, huge fine based on money laundering, illegal money exchange, broke*
>    *the law.*

6. *Your company asking me bank statements is non-sense, don't understand why needing it. I am destroying now all related documents immediately upon completion in order to protect myself and for others against investigation might be come in the future.*
7. *Bankers are hesitating to issue a bank statement in English because promised allowance for them involved, all together 4 officers with me. If you still need a bank statement in any reason, I will discusse (sic) with my bankers to issue it but it's exchange rate will not be accurated (sic) due to involving $$$$ gift. Let me know.*

   *Regards*
   *Kenneth Zong*
   *Anchore Corporation*

33.     On or about June 6, 2011, an unidentified user of the

*orchideagulf@yahoo.com* account emailed KENNETH ZONG to modify the fraudulent

business arrangement to avoid the scrutiny of bank officials responsible for compliance

with Iranian sanctions:

   *"We can only make the cotract (sic) direct with Anchore and Orchidea. As if we involve any Irani company like* [Company A] *in our contract then our banks in UAE will creat problems for us. So isnt this possible that we do contracts same as before. One contract between* Company A *and Anchore , and second one between Orchidea and Anchore."*

34.     After these email exchanges, and the creation of the false companies and

invoices, and between February 2011 and July 2011, KENNETH ZONG, at the direction

of Co-Conspirators B, C, and D, caused Iranian owned funds, equivalent to

approximately $1 billion United States dollars, to be transferred from the restricted

accounts and into more easily tradeable currencies which were then transferred

worldwide as provided below:

| On or About Date | Currency | Amount | USD Equivalent | Country |
|---|---|---|---|---|
| 2/10/2011 | USD | 30,000.00 | 30,000.00 | CANADA |
| 2/10/2011 | USD | 9,980.00 | 9,980.00 | USA |
| 2/10/2011 | USD | 70,600.00 | 70,600.00 | USA |
| 2/10/2011 | USD | 90,000.00 | 90,000.00 | USA |
| 2/10/2011 | USD | 81,923.00 | 81,923.00 | USA |
| 2/10/2011 | USD | 15,587.00 | 15,587.00 | USA |
| 2/10/2011 | USD | 7,987.00 | 7,987.00 | USA |
| 2/10/2011 | USD | 60,000.00 | 60,000.00 | USA |
| 2/10/2011 | USD | 50,000.00 | 50,000.00 | USA |
| 2/10/2011 | USD | 9,900.00 | 9,900.00 | USA |
| 2/10/2011 | USD | 8,000.00 | 8,000.00 | USA |
| 2/10/2011 | USD | 70,677.00 | 70,677.00 | USA |
| 2/10/2011 | USD | 13,000.00 | 13,000.00 | USA |
| 2/10/2011 | USD | 40,000.00 | 40,000.00 | USA |
| 2/10/2011 | USD | 7,000.00 | 7,000.00 | USA |
| 2/10/2011 | USD | 4,780.00 | 4,780.00 | USA |
| 2/10/2011 | USD | 10,439.00 | 10,439.00 | USA |
| 2/10/2011 | USD | 9,985.00 | 9,985.00 | USA |
| 2/10/2011 | USD | 9,000.00 | 9,000.00 | USA |
| 2/10/2011 | USD | 35,000.00 | 35,000.00 | USA |
| 2/10/2011 | USD | 9,999.00 | 9,999.00 | USA |
| 2/11/2011 | EUR | 97,000.00 | 138,040.70 | AUSTRIA |
| 2/11/2011 | EUR | 50,000.00 | 71,155.00 | FRANCE |
| 2/11/2011 | EUR | 6,000.00 | 8,538.60 | FRANCE |
| 2/11/2011 | EUR | 9,460.00 | 13,462.53 | GERMANY |
| 2/11/2011 | EUR | 39,830.00 | 56,682.07 | GERMANY |
| 2/11/2011 | EUR | 31,812.00 | 45,271.66 | GERMANY |
| 2/11/2011 | EUR | 65,772.00 | 93,600.13 | GERMANY |
| 2/11/2011 | EUR | 36,720.00 | 52,256.23 | GERMANY |
| 2/11/2011 | EUR | 116,059.00 | 165,163.56 | GERMANY |
| 2/11/2011 | EUR | 159,999.00 | 227,694.58 | ITALY |
| 2/11/2011 | EUR | 159,980.00 | 227,667.54 | ITALY |
| 2/11/2011 | EUR | 149,999.00 | 213,463.58 | ITALY |
| 2/11/2011 | EUR | 32,480.00 | 46,222.29 | NETHERLANDS |

Case 3:16-cr-00142-SLG-DMS   Document 2   Filed 12/14/16   Page 14 of 22

| | | | | |
|---|---|---|---|---|
| 2/11/2011 | EUR | 33,600.00 | 47,816.16 | SWITZERLAND |
| 2/11/2011 | EUR | 199,980.00 | 284,591.54 | SWITZERLAND |
| 2/15/2011 | USD | 3,514,400.00 | 3,514,400.00 | UAE |
| 2/28/2011 | USD | 1,185,728.00 | 1,185,728.00 | UAE |
| 2/28/2011 | USD | 29,912.00 | 29,912.00 | USA |
| 3/2/2011 | USD | 5,000.00 | 5,000.00 | CANADA |
| 3/3/2011 | USD | 1,215,524.00 | 1,215,524.00 | UAE |
| 3/7/2011 | USD | 3,600,000.00 | 3,600,000.00 | UAE |
| 3/7/2011 | USD | 3,488,400.00 | 3,488,400.00 | UAE |
| 3/7/2011 | USD | 71,600.00 | 71,600.00 | UAE |
| 3/7/2011 | USD | 7,846.57 | 7,846.57 | USA |
| 3/14/2011 | USD | 10,000.00 | 10,000.00 | BAHRAIN |
| 3/14/2011 | USD | 5,002,938.00 | 5,002,938.00 | UAE |
| 3/15/2011 | USD | 100,000.00 | 100,000.00 | USA |
| 3/17/2011 | USD | 4,341,213.00 | 4,341,213.00 | UAE |
| 3/17/2011 | USD | 4,404,164.00 | 4,404,164.00 | UAE |
| 3/22/2011 | USD | 8,000.00 | 8,000.00 | UAE |
| 4/13/2011 | USD | 4,497,464.00 | 4,497,464.00 | UAE |
| 4/14/2011 | USD | 4,975,617.00 | 4,975,617.00 | UAE |
| 4/18/2011 | USD | 5,281,656.00 | 5,281,656.00 | UAE |
| 4/20/2011 | USD | 284,497.00 | 284,497.00 | USA |
| 4/21/2011 | USD | 5,465,810.00 | 5,465,810.00 | UAE |
| 4/21/2011 | USD | 6,149,036.00 | 6,149,036.00 | UAE |
| 4/26/2011 | USD | 9,850,000.00 | 9,850,000.00 | UAE |
| 4/26/2011 | USD | 9,720,000.00 | 9,720,000.00 | UAE |
| 4/26/2011 | USD | 4,419,000.00 | 4,419,000.00 | UAE |
| 4/27/2011 | USD | 495,000.00 | 495,000.00 | USA |
| 4/29/2011 | USD | 19,117,592.00 | 19,117,592.00 | UAE |
| 5/3/2011 | USD | 29,781,758.00 | 29,781,758.00 | UAE |
| 5/3/2011 | USD | 905,500.00 | 905,500.00 | USA |
| 5/16/2011 | USD | 17,299,765.00 | 17,299,765.00 | UAE |
| 5/16/2011 | USD | 20,482,342.00 | 20,482,342.00 | UAE |
| 5/17/2011 | USD | 9,035,115.00 | 9,035,115.00 | UAE |
| 5/17/2011 | USD | 605,000.00 | 605,000.00 | USA |
| 5/23/2011 | USD | 21,138,109.00 | 21,138,109.00 | UAE |
| 5/23/2011 | USD | 23,049,445.00 | 23,049,445.00 | UAE |

| | | | | |
|---|---|---|---|---|
| 5/24/2011 | USD | 500,000.00 | 500,000.00 | USA |
| 5/26/2011 | USD | 21,313,563.00 | 21,313,563.00 | UAE |
| 5/27/2011 | USD | 18,516,151.00 | 18,516,151.00 | UAE |
| 5/27/2011 | USD | 500,000.00 | 500,000.00 | USA |
| 5/31/2011 | USD | 22,623,462.00 | 22,623,462.00 | UAE |
| 5/31/2011 | USD | 20,301,367.00 | 20,301,367.00 | UAE |
| 5/31/2011 | USD | 18,183,685.00 | 18,183,685.00 | UAE |
| 5/31/2011 | USD | 27,330,420.00 | 27,330,420.00 | UAE |
| 6/1/2011 | USD | 1,879,960.00 | 1,879,960.00 | USA |
| 6/7/2011 | USD | 27,293,977.00 | 27,293,977.00 | UAE |
| 6/7/2011 | USD | 46,399,816.00 | 46,399,816.00 | UAE |
| 6/7/2011 | USD | 36,391,969.00 | 36,391,969.00 | UAE |
| 6/8/2011 | USD | 10,000.00 | 10,000.00 | BAHRAIN |
| 6/8/2011 | USD | 10,000.00 | 10,000.00 | BAHRAIN |
| 6/8/2011 | USD | 5,000.00 | 5,000.00 | CANADA |
| 6/8/2011 | USD | 845,000.00 | 845,000.00 | USA |
| 6/9/2011 | USD | 53,894,976.00 | 53,894,976.00 | UAE |
| 6/9/2011 | USD | 54,453,182.00 | 54,453,182.00 | UAE |
| 6/14/2011 | USD | 53,598,198.00 | 53,598,198.00 | UAE |
| 6/14/2011 | USD | 55,862,692.00 | 55,862,692.00 | UAE |
| 6/16/2011 | USD | 1,800,000.00 | 1,800,000.00 | USA |
| 6/20/2011 | USD | 29,713,423.00 | 29,713,423.00 | UAE |
| 6/23/2011 | USD | 29,251,477.00 | 29,251,477.00 | UAE |
| 6/23/2011 | USD | 400,000.00 | 400,000.00 | USA |
| 6/28/2011 | USD | 22,916,437.00 | 22,916,437.00 | UAE |
| 6/29/2011 | USD | 23,221,167.00 | 23,221,167.00 | UAE |
| 6/29/2011 | USD | 22,765,850.00 | 22,765,850.00 | UAE |
| 6/30/2011 | USD | 778,000.00 | 778,000.00 | USA |
| 7/1/2011 | USD | 36,871,923.00 | 36,871,923.00 | UAE |
| 7/4/2011 | USD | 55,067,086.00 | 55,067,086.00 | UAE |
| 7/5/2011 | USD | 820,000.00 | 820,000.00 | USA |
| 7/15/2011 | USD | 63,793,000.00 | 63,793,000.00 | UAE |
| 7/20/2011 | USD | 37,169,842.00 | 37,169,842.00 | UAE |

35.     As payment for his role in the conspiracy, KENNETH ZONG was compensated for his illegal activities in a total amount unknown, but between the equivalent of $10 million to $17 million dollars.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### Unlawful Provision of Services to Iran

36.     The allegations in Paragraphs 1 through 35 are incorporated and re-alleged by reference in this Count.

37.     From on a time unknown, but at least by on or about January, 2011, continuing up to on or about April 2014, in the District of Alaska and elsewhere, the defendant KENNETH ZONG did knowingly and willfully violate the prohibition against providing services to Iran, without first having obtained the required licenses and authorizations from the U.S. Department of the Treasury's OFAC, located in the District of Columbia.

All in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Sections 560.203 and 560.204, Title 18, United States Code, Section 2.

## COUNT THREE
### Money Laundering Conspiracy

38.     The Grand Jury re-alleges and incorporates herein by reference the factual allegations set forth in paragraphs 1 through 37.

39.     Beginning in or about January 2011, the exact date being unknown to the grand jury, and continuing up to on or about April 2014, in the District of Alaska and

elsewhere, the defendant, KENNETH ZONG, did knowingly combine, conspire, confederate and agree with unindicted Co-Conspirator A, and others, both known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Section 1957, to wit: to knowingly engage and attempt to engage in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, to wit: a violation of the International Emergency Economic Powers Act, Vio. of 50 U.S.C. § 1705, and the Iranian Transaction Regulations, 31 C.F.R. Part 560.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS FOUR THROUGH FORTY-SEVEN
**Money Laundering**

40.     The allegations of paragraphs 1 through 39 are alleged as is if fully set forth herein.

41.     Beginning on or about January 2011, and continuing up to the month of April 2014, in the District of Alaska, and elsewhere the defendant, KENNETH ZONG and unindicted Co-Conspirator A, did knowingly engage in and attempt to engage in monetary transactions by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, transactions involving wire transfers of funds, check processing and bank deposits of United States currency as set out below, with such property having been derived from specified unlawful activity, that is, International Emergency Economic Powers Act, Vio.

Case 3:16-cr-00142-SLG-DMS   Document 2   Filed 12/14/16   Page 18 of 22

of 50 U.S.C. § 1705, Iranian Transactions Regulations, Vio. of 31 C.F.R. Part 560, with each monetary transaction identified below alleged as a separate and distinct count:

| Count | On Or Around Date | Unindicted Co-Conspirator | Amount | Transaction | Bank Account |
|-------|-------------------|---------------------------|--------|-------------|--------------|
| 4 | 7/27/2011 | Unindicted Co-Conspirator A | 400,000.00 | Withdrawal and purchase of official check 024679491 payable to a business | MSL One's Key 4262 |
| 5 | 7/27/2011 | Unindicted Co-Conspirator A | 400,000.00 | Deposit of official check 024679491 | Unindicted Co-Conspirator A's KIS 5394 |
| 6 | 8/4/2011 | Unindicted Co-Conspirator A | 34,353.00 | Withdrawal and purchase of official check 024734429 for $34,353 payable to car dealership for the purchase of a 2011 Subaru Outback, VIN 4S4BRDLC4B2431374 | MSL One's Key 4262 |
| 7 | 8/4/2011 | Unindicted Co-Conspirator A | 39,000.00 | Withdrawal and purchase of official check 024734430 for $39,000 payable to jewelry company for the purchase of a diamond engagement ring and wedding band | MSL One's Key 4262 |
| 8 | 8/15/2011 | Unindicted Co-Conspirator A | 121,906.00 | Wire transfer to car dealership for a 2007 Bentley Continental, VIN SCBDR33W27C046255 | MSL One's Key 4262 |
| 9 | 9/6/2011 | Unindicted Co-Conspirator A | 3,360,000.00 | Transfer to MSL One's KIS account ending 5600 | MSL One's Key 4262 |
| 10 | 9/26/2011 | Unindicted Co-Conspirator A | 1,200,000.00 | Transfer from MSL One's KIS account ending 5600 | MSL One's Key 4262 |
| 11 | 9/28/2011 | Unindicted Co-Conspirator A | 1,247,000.00 | Wire transfer to MSL One's WF account ending 6496 | MSL One's Key 4262 |
| 12 | 10/25/2011 | Unindicted Co-Conspirator A | 88,000.00 | Wire transfer to car dealership for 2008 Porsche 911, VIN WP0AD29918S783402 | MSL One's Key 3611 |

Case 3:16-cr-00142-SLG-DMS   Document 2   Filed 12/14/16   Page 19 of 22

| | | | | | |
|---|---|---|---|---|---|
| 13 | 11/15/2011 | Unindicted Co-Conspirator A | 250,000.00 | Transfer to the account of family member for earnest money for refinance of residence in Costa Mesa, California | MSL One's WF 6496 |
| 14 | 12/1/2011 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Anchore Corporation | MSL One's Key 4262 |
| 15 | 1/3/2012 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Anchore Corporation | MSL One's Key 4262 |
| 16 | 2/1/2012 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Dynamic First | MSL One's Key 4262 |
| 17 | 2/22/2012 | Unindicted Co-Conspirator A | 700,000.00 | Transfer from MSL One's KIS account ending 5600 | MSL One's Key 4262 |
| 18 | 2/22/2012 | Unindicted Co-Conspirator A | 700,000.00 | Wire transfer to Kenneth Zong | MSL One's Key 4262 |
| 19 | 3/1/2012 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Dynamic First | MSL One's Key 4262 |
| 20 | 4/2/2012 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Dynamic First | MSL One's Key 4262 |
| 21 | 4/9/2012 | Unindicted Co-Conspirator A | 113,354.20 | Withdrawal and purchase of official check 025197991 payable to Title Company for the purchase of home in Eagle River, Alaska | MSL One's Key 4262 |
| 22 | 5/1/2012 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Dynamic First | MSL One's Key 4262 |
| 23 | 6/1/2012 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Dynamic First | MSL One's Key 4262 |
| 24 | 7/2/2012 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Dynamic First | MSL One's Key 4262 |
| 25 | 8/1/2012 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Dynamic First | MSL One's Key 4262 |
| 26 | 9/4/2012 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Dynamic First | MSL One's Key 4262 |
| 27 | 10/1/2012 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Dynamic First | MSL One's Key 4262 |
| 28 | 11/1/2012 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Dynamic First | MSL One's Key 4262 |
| 29 | 11/20/2012 | Unindicted Co-Conspirator A | 1,000,000.00 | Withdrawal and purchase of cashier's check 0400101533 payable to MSL Gulf Trading Two LLC | MSL One's WF 6496 |
| 30 | 11/28/2012 | Unindicted Co-Conspirator A | 1,000,000.00 | Deposit of cashier's check 0400101533 | MSL Two's Key 7141 |

Page 20 of 22

| | | | | | |
|---|---|---|---|---|---|
| 31 | 12/3/2012 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Dynamic First | MSL One's Key 4262 |
| 32 | 1/2/2013 | Unindicted Co-Conspirator A | 13,000.00 | Wire transfer to Dynamic First | MSL One's Key 4262 |
| 33 | 1/4/2013 | Unindicted Co-Conspirator A | 443,497.17 | Wire deposit from First American Title of proceeds from the sale of home in Eagle River, Alaska | MSL One's Key 4262 |
| 34 | 1/9/2013 | Unindicted Co-Conspirator A | 422,300.10 | Transfer to MSL One's KIS account ending 5600 | MSL One's Key 4262 |
| 35 | 1/24/2013 | Unindicted Co-Conspirator A | 1,000,000.00 | Withdrawal | MSL Two's Key 7141 |
| 36 | 1/24/2013 | Unindicted Co-Conspirator A | 1,000,000.00 | Deposit | MSL One's Key 4262 |
| 37 | 2/8/2013 | Unindicted Co-Conspirator A | 920,000.00 | Transfer to MSL One's KIS account ending 5600 | MSL One's Key 4262 |
| 38 | 4/24/2013 | Unindicted Co-Conspirator A | 350,000.00 | Transfer from MSL One's KIS account ending 5600 | MSL One's Key 4262 |
| 39 | 5/2/2013 | Unindicted Co-Conspirator A | 250,000.00 | Deposit of loan proceeds for the purchase of a California yacht charter business | MSL One's Key 4262 |
| 40 | 5/9/2013 | Unindicted Co-Conspirator A | 326,000.00 | Wire transfer to law firm for a 25% membership interest in a 2008 Sunseeker 60 Manhattan Motor Yacht, vessel name "*IOS*," hull number XSK04163K708 | MSL Two's Key 5095 |
| 41 | 7/2/2013 | Unindicted Co-Conspirator A | 85,511.02 | Check 1018 payable to car dealership for the purchase of a 2013 Mercedes-Benz GL 450, VIN 4JGDF7CE2DA248245 | MSL One's Key 4262 |
| 42 | 12/30/2013 | Unindicted Co-Conspirator A | 1,409,925.93 | Transfer from MSL One's KIS account ending 5600 | MSL One's Key 2140 |
| 43 | 1/08/2014 | Unindicted Co-Conspirator A | 100,000.00 | Wire transfer to LLC | MSL One's Key 4262 |
| 44 | 2/10/2014 | Unindicted Co-Conspirator A | 110,000.00 | Wire transfer from LLC | MSL One's Key 4262 |
| 45 | 2/21/2014 | Unindicted Co-Conspirator A | 500,000.00 | Principal advance on commercial loan | MSL One's Key 4262 |
| 46 | 2/21/2014 | Unindicted Co-Conspirator A | 500,000.00 | Wire transfer to It LLC | MSL One's Key 4262 |
| 47 | 4/2/2014 | Unindicted Co-Conspirator A | 100,000.00 | Wire transfer to LLC for an interest in fitness gym | MSL One's Key 4262 |

All of which is in violation of and contrary to Title 18, United States Code, Section 1957(a).

A TRUE BILL.

s/ Grand Jury Foreperson
GRAND JURY FOREPERSON

s/ Steven E. Skrocki
STEVEN E. SKROCKI
United States of America
Assistant U.S. Attorney

s/ Frank V. Russo for
KAREN L. LOEFFLER
United States of America
United States Attorney

DATE: 12/14/16